## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**THOMAS EDWARD GARRETT**                    **CIVIL ACTION**

**VERSUS**                                                    **NO:  05-1492-CJB-SS**

**DELTA QUEEN STEAMBOAT
COMPANY, INC.**

### REPORT AND RECOMMENDATION

Before the undersigned is the issue of the validity of a settlement agreement.

### Procedural Background

On March 21, 2005, the plaintiff, Thomas Edward Garrett ("Garrett"), represented by the law firm of Favret, Demarest, Russo and Lukewitte ("Favret Firm"), filed a petition for seaman's benefits in state court.  He alleged that:  (1) on March 22, 2004, he was a professional photographer on the M/V American Queen, which was owned by defendant, Delta Queen Steamboat Company, Inc. ("Delta Queen"); (2) on that date he suffered a serious heart attack which required that he be removed from the vessel to a hospital; (3) he was released for duty a week later; and (4) he was entitled to maintenance and cure and payment of medical expenses.  Rec. doc. 3 at pp. 6-10.

Delta Queen, represented by Wilton Bland ("Bland"), removed the action to federal court. Rec. doc. 1.  It denied that: (1) it was Garrett's employer;  (2) it owed any maintenance and cure to Garrett; or (3) it made any misrepresentation to him.  It alleged that:  (1) J. Bruce Summers Photography ("Summers") was granted the photographic concession on the vessel; (2) Summers was

required to provide all photographic services on the vessel, including the personnel and equipment necessary for their performance; and (3) Summers and its personnel, including Garrett, were independent contractors.  Delta Queen demanded that Summers defend, indemnify and hold it harmless.  Rec. doc. 4.  Garrett amended his petition to add Summers as a defendant.  Rec. doc. 8.  Summers denied all liability and alleged that Garrett was the borrowed employee of Delta Queen. Rec. doc. 14.[1]

A scheduling order was entered setting the pretrial conference for August 24, 2006 and the trial for September 18, 2006.  The parties were ordered to schedule a settlement conference with the assigned Magistrate Judge.  Rec. doc. 15.  A telephone settlement conference was held on July 13, 2006 with the attorneys for the parties participating; Seth Schaumburg ("Schaumberg") of the Favret Firm, and Bland.  There were follow-up settlement discussions. Rec. doc. 30.  On August 14, 2006, the undersigned reported that, after further discussion among the parties, the case was settled, rec. doc. 36, and thereafter the District Judge dismissed the case.  Rec. doc. 37.

Counsel for Delta Queen notified the undersigned of a problem with the settlement.  Rec. doc. 38.  A telephone conference was scheduled for Tuesday, October 31, 2006.  Rec. doc. 38.  Garrett, Schaumburg and Bland participated in the telephone conference.  R. 25.  After listening to their respective positions regarding settlement, an evidentiary hearing was scheduled regarding the validity of the settlement.  Rec. doc. 38.  The hearing was conducted on November 9, 2006 with testimony and participation from Garrett, Schaumburg and Bland.  Rec. doc. 40.  After the hearing, counsel for Garrett filed a motion to withdraw as counsel for Garrett.  Rec. doc. 42.

---

[1] Bruce Summers died during the pendency of the lawsuit and was not a contributor to the alleged settlement.

## **Motion to Disqualify**

At the evidentiary hearing, Garrett, acting on his behalf, made an oral motion to recuse the undersigned.[2]  R. 42-45.  The motion was based upon the requirement that a judge should avoid impropriety and the appearance of impropriety in all activities.  The motion will be treated as a timely motion under 28 U.S.C. § 455(a).  Section 455(a) states that a judge should recuse himself "in any proceeding in which his impartiality might reasonably be questioned."  Id.  "In order to determine whether a court's impartiality is reasonably in question, the objective inquiry is whether a well-informed, thoughtful and objective observer would question the court's impartiality."  Trust Co. of Louisiana v. N.N.P., 104 F.3d 1478, 1491 (5th Cir. 1997).  The purpose of Section 455(a) and the principle of recusal itself is not just to prevent actual partiality but to avoid even the appearance of impartiality.  United States v. Jordan, 49 F.3d 152, 155 (5th Cir. 1995).  The analysis of a Section 455(a) claim must be guided not by comparison to similar situations addressed by prior experience, but rather by an independent examination of the facts and circumstances of the particular claim.  United States v. Bremers, 195 F.3d 221, 226 (5th Cir. 1999).

The undersigned's only participation in this matter was in connection with the settlement conferences conducted pursuant to the District Judge's order.  During a settlement conference a judge acquires discrete knowledge of the parties' evaluation of their respective positions regarding settlement.  If he later discovers that he will be the non-jury fact finder as to an issue addressed at the settlement conference, it is not appropriate for him to function as the fact finder and the  judge

---

[2]  The transcript of the hearing was filed in the record.  See Rec. doc. 44.  All references to the transcript will be shown as R. followed by the page number from the transcript.

3

must recuse himself.  <u>Becker v. Tidewater, Inc</u>., 405 F.3d 257, 260 (5th Cir. 2005).  This rule does not apply here.  While the undersigned did acquire knowledge of the parties' positions regarding settlement, the undersigned was not a participant in the communications between Garrett's counsel and Garrett that are the basis of the dispute over the validity of the settlement.

Garrett expressed the concern that, because the undersigned participated with the attorneys in the mediation of a settlement, the undersigned was so vested in the outcome of the settlement as to cause the undersigned to be prejudiced.  The undersigned usually schedules about eight settlement conferences a week.  Many cases require follow-up telephone calls in order to determine whether they can be settled.  The parties are required to submit position papers a week in advance of the settlement conference and each is reviewed and given careful consideration prior to the settlement conference.  With follow-up calls from past settlement conferences, preparation for settlement conferences in the coming week and participation in many settlement conferences during a week, the undersigned may be working on twenty to thirty settlements at a time.  Each case demands a significant effort.  In some instances, the case settles while in other instances they do not.  The undersigned appreciates the importance of this case to Mr. Garrett.  It is his only case.  It is not, however, the only the case referred to the undersigned for a settlement conference.  It was not an exceptional case nor did it require exceptional effort on the undersigned's part.

If Garrett's position were accepted, then any judge or magistrate judge who conducted a settlement conference would be precluded in all such cases from considering the validity of the settlement.  Section 455(a) does not command this result.  It is recommended that the motion to recuse be denied.

4

## Law Applicable to Validity of Settlement Agreement

In Strange v. Gulf & South American Steamship Company, Inc., 495 F.2d 1235 (5th Cir. 1974), the Fifth Circuit said,

> In the absence of a factual basis rendering it invalid . . ., an oral agreement to settle a personal injury cause of action within the admiralty and maritime jurisdiction of the federal courts is enforceable and cannot be repudiated.

Id. at 1236.  See also Fulgence v. J. Ray McDermott & Co., 662 F.2d 1207, 1209, n. 2 (5th Cir. 1981) (federal law determines the validity of oral settlement agreements in Title VII employment discrimination actions; citing Strange with approval); and Mobley v. Montco, Inc., 2004 WL 307478 (E.D.La.) (Berrigan, J.).  In Fulgence, the Fifth Circuit rejected the contention that state law applied and that a settlement was invalid unless it was reduced to writing as required by La. Civ. Code Ann. art. 3071.  662 F.2d at 1209.  The issue here is whether there was an oral agreement to settle the case.

## Undisputed Facts

On March 3, 2005, a debt collector sent a letter to Garrett seeking payment of $3,111.00 for collection of amounts owed to St. James Parish Hospital.  Other invoices or collection letters are dated at various dates from June 5, 2005 through May 31, 2006 for charges at other health care providers in connection with Garrett's illness.  The total for all providers was $72,418.69.[3]

On March 10, 2005, Garrett signed a contract for legal representation with the Favret Firm and J. Paul Demarest ("Demarest") in connection with his claim for the incident that occurred on

---

[3]  Joint Exhibit 9 - Exhibit 1 - Thomas Garrett's Medical Expenses.

March 22, 2004.  The contingent fee was one-third of any recovery through the trial stage.[4]

On June 21, 2006, Schaumburg made a written settlement demand on the defendants for $112,568.69.  The letter contended that Garrett was Delta Queen's borrowed employee.  It urged that Garrett was entitled to nine days of maintenance for March 23, 2004 through March 31, 2004, reimbursement of $87,343.69 in medical expenses, reimbursement of future medical expenses, and attorneys' fees and costs of $25,000.00.  Schaumburg reported that the providers would be contacted to obtain reductions in the medical expenses to assist in settlement.[5]

The undersigned conducted a settlement telephone conference on July 13, 2006 with the attorneys for the parties.  Rec. doc. 30.  On July 13, 2006, Schaumburg sent a letter to Bland.  Schaumburg reported, as discussed at the settlement conference, that in response to Delta Queen's offer of $15,000.00, plaintiff made a counteroffer of $40,000 conditioned on Schamburg securing an 80% reduction in Charity Hospital's bill of $55,779.99.  In the letter, Schaumburg argued that Garrett was Delta Queen's borrowed employee.[6]

On July 31, 2006, Schaumburg sent a letter to Garrett reporting on their (Schaumburg's and Garrett's) meeting with Demarest.  The letter reported an agreement or understanding that Schaumburg and Demarest would proceed toward the September 18, 2006 trial date and attempt to obtain the largest settlement possible on the eve of trial, but that the trial should be avoided "at all costs due to the likelihood that we would not succeed in proving that you were a borrowed servant

---

[4] Joint Exhibit 3 - Contract for Legal Representation, dated March 10, 2005.

[5] Joint Exhibit 14 - Letter from Schaumburg to Bland and Stanley Cohn, counsel for Summers, dated June 21, 2006.

[6] Joint Exhibit 15 - Letter from Schaumburg to Bland, dated July 13, 2006.

of Delta Queen."[7]  The letter reported that attempts would be made to negotiate reductions of the outstanding bills from the medical providers.  Id.  Garrett received the letter.  R. 20-22.  On that same day, Schaumburg wrote to counsel for Delta Queen and Summers and requested that Delta Queen put more money on the table so there was a "reasonable amount to work with in trying to come to terms with the medical providers."[8]  He stated that, if not, it would be necessary to schedule depositions.  Id.  On that same date, Schaumburg sent letters to various medical providers requesting 80% reductions.[9]  Each of these letters contained an identical report on the status of the case. Each stated that Garrett's attorneys were contending that Garrett was a borrowed servant for Delta Queen and that reimbursement of the medical expenses was claimed.  Each stated that Delta Queen contended that Garrett was not its employee and Delta Queen was not responsible for his medical expenses.  Garrett's attorney sought reductions in the amounts of the outstanding medical bills in an effort to settle the case.  Each letter contained the following assessment by Garrett's counsel on the merits of Garrett's claim:

> We are not encouraged by our chances of succeeding at trial and believe the only way we can get this matter resolved is if the various medical providers are willing to accept a large reduction in their outstanding lien amounts making a settlement more palatable to Delta Queen Steamboat Company, Inc.

Id.  Garrett received copies of these letters.  R. 20-22.

On August 4, 2006, LSU-Charity Hospital reported that it would settle its lien in the amount

---

[7]  Joint Exhibit 1 - Letter from Schaumburg to Garrett, dated July 31, 2006.

[8]  Joint Exhibit 9 - Exhibit 3 - Letter from Schaumburg to Bland and Cohn, dated July 31, 2006.

[9]  Joint Exhibit 9 - Exhibits 4-8, including letter from Schaumburg to Trans Financial Companies, dated July 31, 2006.

of $55,767.99 for $15,500.00.[10]  On that date, Schaumburg communicated with Bland by letter and reported a willingness to accept a lump sum of $25,000 and, at that settlement level, the LSU-Charity Hospital lien would be settled.  The letter reported that the other providers had not notified Schaumburg of a lien and had not intervened in the lawsuit.  Schaumburg reported that Garrett was told that these medical providers would either seek collection directly from him or write off their outstanding bills.[11]

On August 14, 2006, Bland notified Schaumburg, counsel for Summers, and the undersigned that Delta Queen agreed to pay $24,500 to settle all of Garrett's claims against Delta Queen.[12]  On August 14, 2006, the undersigned reported the case was settled.  Rec. doc. 36.  On August 15, 2006, Schaumburg prepared a letter to Bland confirming settlement of the case for $24,500.00.[13]  Although the letter is dated August 15, 2006, it was not faxed to Bland until August 16, 2006 at 2:16 p.m.  Id.  Schaumburg spoke to Garrett on the telephone on August 16, 2006.[14]  Schaumburg did not have the release and other settlement papers prepared by Bland when he spoke to Garrett on August 16, 2006.  R. 28, 31 and 57-58.

On September 14, 2006, Bland forwarded to Schaumburg a release, motion to dismiss,

---

[10]  Joint Exhibit 9 - Exhibit 9 - Letter from LSU Healthcare to Schaumburg, dated August 4, 2006.

[11]  Joint Exhibit 6 - Letter from Schaumburg to Bland, dated August 4, 2006.

[12]  Joint Exhibit 4 - Exhibit 9 - E-mail from Bland to Schaumburg and Cohn with copy to undersigned, dated August 14, 2006.

[13]  Joint Exhibit 9-Exhibit 10 - Letter from Schaumburg to Bland, dated August 15, 2006 but with a fax transmittal sheet of August 16, 2006 at 2:16 p.m.

[14]  R. 33 and Joint Exhibit 9 - Exhibit 11 Favret law firm-Detail Transaction List for August 16, 2006.

settlement check for $24,500.00 and the LSU-Charity Hospital lien notice.[15]  On September 20,

2006, Schaumburg forwarded the settlement papers to Garrett and requested that he sign the release

and an authorization for the Favret law firm to endorse the check.[16]

## Evidentiary Hearing

The court explained that the purpose of the hearing was to determine whether the settlement

agreement was enforceable.[17]  R. 4.

1. Garrett's Testimony

Garrett testified that he contracted for Demarest to represent him and that Schaumburg was

an assistant to Demarest.  R. 8 and 26.  Garrett had discussions with Demarest about the merits of

the case.  Garrett said that Demarest reported that there would be a battle on the negligence part of

the claim, but not for the maintenance and cure benefits.  R. 12.  Garrett testified he did not have any

discussions with his attorneys in which he was told that there was a real dispute as to whether he was

an employee of Delta Queen.  R. 13.  He stated he did receive correspondence from Schaumburg

---

[15]  Joint Exhibit 4 - Exhibit 11 - Letter, dated September 14, 2006, from Bland to Schaumburg transmitting settlement papers and check.

[16]  Joint Exhibit 9 - Exhibit 12 - Letter, dated September 20, 2006, from Schaumburg to Garrett transmitting settlement papers.

[17]  At the outset of the hearing Garrett requested that it be postponed until he could find legal representation. He reported that he was on medication and his blood pressure was up.  He was upset at the prospect of participating in the hearing.  R. 5-6.  Garrett was asked to proceed with the hearing.  The parties were told that the matter would be held open to permit Garrett to submit a written statement of his position and to have an attorney enroll on his behalf.  R. 6. At the conclusion of the hearing, it was reported that the matter would be held open until November 15, 2006.  R. 87. By minute entry the date was extended to November 22, 2006.  Rec. doc. 40.  Garrett did not submit anything further to the court and new counsel has not enrolled on his behalf.

9

regarding the Ruiz factors,[18]  r. 13, and understood that Delta Queen disputed his status as a borrowed servant.  R. 13.  As he received his medical bills, he gave them to Demarest and Schaumburg. R. 9.

Garrett denied having a meeting with Demarest and Schaumburg at which time it was decided they would not go to trial but instead would try to negotiate reductions in the medical expenses and obtain the best settlement possible with the defendants.  R. 19-20. He denied having a conversation with Schaumburg during which the Ruiz factors were reviewed and he was provided with an explanation as to why his counsel did not believe that he would prevail on most of them. R. 12 and 19.

It was Garrett's understanding that his attorneys planned to work out a deal with Charity Hospital as to what it would accept in settlement.  R. 8.  His attorneys got Charity Hospital to agree to accept less than the amount of its bill.  R. 10.  Delta Queen and Garrett's attorneys wanted to get Charity Hospital taken care of while there was an agreement with it to accept less than the amount of its bill.  R. 10.

On August 16, 2006, Schaumburg told Garrett that there was an offer from Delta Queen to pay Charity Hospital less than the amount of its bill and Delta Queen wanted to resolve the hospital's claim.  R. 11.  Garrett believed that it was to Delta Queen's advantage to pay off Charity Hospital,  since it would accept much less than its claim and Delta Queen would avoid having to pay

---

[18] Ruiz v. Shell Oil Company, 413 F.2d 310 (5th Cir. 1969).  The July 13, 2006 letter from Schaumburg to Bland with a copy to Garrett contains three points:  (1) a counteroffer of $40,000 (conditioned on 80% reduction in Charity's bill) in reply to Bland's offer of $15,000; (2) a recitation of the ten Ruiz factors with Schaumburg's statement of Garrett's position on each factor; and (3) a commitment to pursue reductions in Garrett's medical expenses.  Among the exhibits filed with the Court, this is the first one sent to Garrett with a discussion of the Ruiz factors.  Joint Exhibit 15.

the full amount after the trial of the case.  R. 19-20.  Garrett testified there was no discussion about the suit against Delta Queen.  R. 11.  Garrett testified that he believed Delta Queen was going to pay the hospital's bill and allow Garrett to proceed with his suit.  R. 11-12 and 33.  He said that Delta Queen's offer to pay off Charity Hospital indicated that it believed it could lose more down the road. R. 14.  Garrett's understanding was that the settlement was not the end of the case.  R. 18.  Garrett recalled that the telephone conversation with Schaumburg was only about three minutes.  R. 33.  He emphasized that Schaumburg prepared the letter to Bland confirming the settlement on August 15, but Schaumburg did not speak to him until August 16.  R. 36-37.

Garrett reviewed the settlement papers prepared by Delta Queen that were sent to him by Schaumburg.  He testified that the terms of the documents were not what Schaumburg reported to him on August 16, 2006.  R. 24.  The settlement papers were entirely different from Garrett's understanding following the August 16, 2006 phone conversation with Schaumburg.  R. 18.  As an example, Garrett cited the warranty in the settlement that he had discussed his condition with physicians of his own choosing and, in executing the release, he completely gave up his rights against Delta Queen.  He stated that he had not been to a doctor of his own choosing.  R. 30.

In Garrett's view, it came down to whether he would be forced to sign an agreement which was not what he had agreed to on the phone.  R. 28.  He acknowledged that after he refused to sign the papers, Demarest spent a lot of time on the phone trying to convince him to accept the settlement.  R 38-39.

Garrett contended that a phone conversation could only provide a tentative agreement and a person could not reach an agreement on a settlement until he saw what was in the settlement

11

papers.  R. 84.  He believes that until a person puts his signature on the settlement papers, there was no agreement.  R. 84.

Garrett contended that there was nothing in the settlement for him.  R. 41.  Even if the settlement provided him with $5,000 for future medical expenses, it was not acceptable to him because he had a right to maintenance and cure.  R. 67.  He asserted that the only one who had any interest in the settlement was Schaumburg because he would receive his one third contingent fee plus expenses.  R. 24-25.

Garrett did not care about the bill owed to the hospital or other medical bills because his interest in the case was in future medical expenses.  With his medical condition and without medical benefits, he is in the LSU-Charity Hospital system and, as a result, he does not believe he receives proper medical care for his medical condition.  R. 15.  For instance, he received stents when he believes he should have received by-pass surgery.  R. 15.  The dollar amount of the settlement, even a million dollars, was unimportant to him.  What he wanted was the ability to see a doctor of his choice and have the procedures performed that were recommended by his doctor.  R. 16.

2.  Schaumburg's Testimony

Schaumburg was sworn as a witness and testified in response to questions from Garrett and the court.  Schaumburg also made some statements during his examination of Garrett.

Demarest met with Garrett and signed the contract with him for the representation.  R. 49. Demarest and Schaumburg work together.  Demarest was diagnosed with cancer and was out of the office for about four months.  During this interval, Schaumburg took over the lead on the case.  R. 49. The goals of the litigation were to: (1) satisfy the approximately $70,000 in outstanding medical

bills; (2) obtain coverage of future medical expenses; and (3) obtain wages owed to Garrett.  R. 74.

From the beginning Demarest knew it would be a difficult case.  R. 55.

After Schaumburg took over the case, he had conversations with Garrett and Bland about the case.  R. 49.  He realized that Garrett would have a very difficult time prevailing on the issue of whether he was Delta Queen's borrowed servant because  Garrett did not satisfy the more important factors identified in Ruiz.  During the course of the litigation the facts did not develop in Garrett's favor.  R. 74.  Further, the Charity Hospital lien had to be satisfied and it had a priority on any funds recovered in the litigation.  R. 80.

Schaumburg described a meeting among Demarest, Schaumburg and Garrett.  The two attorneys reviewed each of the Ruiz factors with Garrett and explained to him the difficulties he faced in proving each of them.  R. 50.  They explained that they felt he had no chance to prevail at the trial.  R. 50 and 74.  They recommended a strategy whereby the trial date would be maintained, but at some point prior to the trial they would negotiate a settlement.  R. 51 and 76.  Negotiations would be initiated with the medical providers for reductions in the amounts sought by them.  R. 51. The goal was to get as much as money as possible on the table from Delta Queen, while negotiating low payment terms with the medical providers.  R. 60.

Schaumburg testified that it was in Garrett's interest to resolve the $55,000 claim by Charity because if he went to trial and lost, he would be left with outstanding bills of $70,000 or more.  R. 77-78.  Schaumburg testified that at some point in the negotiations, Garrett said he would settle the case if Schaumburg could get $5,000 put into a separate fund to pay future medical expenses.  R. 52.  Schaumburg explained the difficulties that he saw with this concept.  R. 52.  In any event,

nothing came of it because Delta Queen was not willing to put up the additional funds.  R. 52.

In response to Schaumburg's offer of $25,000, Delta Queen agreed to pay $24,500.  R. 52. Schaumburg called Garrett and explained there was an offer of $24,500.  Garrett was told he would not receive any money but it would go to pay outstanding medical expenses.  R. 53.  Garrett approved the settlement.  Id.  Schaumburg explained that the Charity lien would be resolved and the rest of the providers would not receive anything but eventually he believed they would leave Garrett alone because of his distressed financial circumstances.  R. 54.  On August 16, 2006 Garrett gave him permission to settle the case for $24,500.  It was clear to Schaumburg that Garrett understood that the case was going to be conclusively settled for the sum of $24,500, because he told Garrett that the case would not go to trial and that the case was over.  R. 59.

The division of the $24,500 was:  (a) $15,500 to Charity Hospital; (b) $1,130.68 to the Favret law firm for expenses; and (c) $7,868.32 to the Favret firm for its fee.  The fee was a slight reduction from the one third provided in the contract.  R. 55.  Schaumburg testified that he and Demarest put in a lot of effort on behalf of Garrett.  R. 55-56.

Schaumburg testified that after Garrett objected to the settlement Garrett came to the office and told them he did not want to accept it because when he filed for bankruptcy it would look better to have the $55,000 Charity Hospital bill unpaid.  R. 37-38.

3.  Comments by Bland

Bland did not testify, but he commented on several issues during the course of the testimony from Garrett and Schaumburg.  Bland acknowledged that the written settlement agreement prepared by him was broader than Garrett's complaint.  He agreed to revise the settlement agreement so it

14

related only to maintenance and cure and only released Garrett's claims against Delta Queen for: (1) maintenance and cure; (2) attorneys' fees; and (3) penalties for failure to pay maintenance and cure. R. 17.

In connection with Schaumburg's testimony concerning Garrett's request for an additional $5,000 to cover future medical expenses, Bland reported that within a week or so prior to the actual settlement, there was a discussion about putting an extra $5,000 in a fund for future medical expenses. R. 69. Delta Queen did not want the responsibility of administering a fund for Garrett, and the $24,500 was a lump sum to resolve the entire case. R. 70-71.

## Analysis

There were three parties to the disputed settlement: (1) LSU-Charity Hospital; (2) Delta Queen; and (3) Garrett. Garrett owed LSU-Charity Hospital $55,779.99. On July 18, 2005, it notified Demarest of: (1) the amount due; (2) pursuant to La. R.S. 9:4752, its privilege on the proceeds of any recovery for personal injury; and (3) its right of subrogation under La. R.S. 46:8-15.[19] On July 31, 2006, Schaumburg sought the cooperation of LSU-Charity Hospital in compromising the claim. Schaumburg reported that he was not encouraged by Garrett's chances at trial. He sought an eighty percent reduction in the amount owed.[20] In reply, LSU-Charity Hospital agreed to accept $15,500 or a reduction of more than $40,000 in the amount owed by Garrett.[21] The disputed settlement was premised on the condition that LSU-Charity Hospital would receive

---

[19] Joint Exhibit 9 - Exhibit 1 - Attachment-Letter of July 18, 2005 to Demarest from LSU-Charity Hospital.

[20] Joint Exhibit 9 - Exhibit 6 - Letter from Schaumburg to LSU-Charity Hospital, dated July 31, 2006.

[21] Joint Exhibit 9 - Exhibit 9 - Letter from LSU-Charity Hospital to Schaumburg.

$15,500. There is no evidence that LSU-Charity Hospital colluded with anyone to gain an advantage over Garrett. To the contrary, the law and evidence demonstrate that it had a priority on any proceeds derived from Garrett's suit.[22] The evidence demonstrates that the willingness of LSU-Charity Hospital to discount the amount owed by more than $40,000 was based on Schaumburg's representation that Garrett did not have a good case.

The second party to the disputed settlement was Delta Queen. When it answered the complaint, it denied that Garrett was its employee and sought indemnity from Garrett's employer, Summers. Rec. doc. 4. On June 21, 2006, Schaumburg made a settlement demand on Delta Queen for $112,568.69. He contended that Garrett was Delta Queen's borrowed employee.[23] On July 13, 2006, there was a settlement conference with the attorneys. Rec. doc. 30. Delta Queen offered $15,000 to settle the case. In reply, Schaumburg made a counteroffer of $40,000 conditioned on an eighty percent reduction in LSU-Charity Hospital's invoices.[24] From July 13, 2006 through August 14, 2006, Delta Queen increased its settlement offer to $24,500 but it refused to fund a medical expense account for Garrett's future medical needs. There is no evidence that Delta Queen colluded with anyone in agreeing to pay to effect a settlement.

In Ruiz, the Fifth Circuit described the factors to be considered in determining whether the doctrine of borrowed servant was applicable to the maritime personal injury claim before it. 413 F.2d at 310. Ruiz is the controlling precedent for the resolution of this issue in the Fifth Circuit.

---

[22] Indeed, if the case was tried, LSU-Charity would be entitled to the first $55,799.99 recovered. Only after recovery of more than that amount would Garrett recover anything.

[23] Joint Exhibit 14 - Letter from Schaumburg to Bland and Cohn, dated June 21, 2006.

[24] Joint Exhibit 15 - Letter from Schaumburg to Bland, dated July 13, 2006.

Delta Queen denied that the doctrine was applicable to Garrett.  LSU-Charity Hospital accepted Schaumburg's assessment that the case was weak on this issue.

Garrett, however, contends that he had a strong case that he was owed maintenance and cure by Delta Queen.  He refers to a November 3, 2004 decision by the United States District Court for the Southern District of New York in which the court decided that the plaintiff, an independent contractor, was entitled to pursue an unseaworthiness claim.[25]  See Radut v. State Street Bank & Trust Co., 2004 WL 2480467 (S.D.N.Y.), 2005 A.M.C. 413.  Pursuant to Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872 (1946), the duty of seaworthiness was extended to the plaintiff.  Garrett did not make a claim for unseaworthiness and negligence.  The obligation to provide maintenance and cure is consistently recognized as an implied provision in a contract of marine employment.  Aguilar v. Standard Oil Co. U. S., 318 U.S. 724, 63 S.Ct. 930, 933-34.  Garrett did not have a contract of marine employment with Delta Queen.  In order to establish his claim for maintenance and cure, Garrett was required to demonstrate that he was Delta Queen's borrowed servant under Ruiz. The Radut decision is not applicable to his claim for maintenance and cure.

The evidence does not contradict Delta Queen's assessment of Garrett's limited chance of prevailing on the borrowed servant doctrine, nor does it contradict Schaumburg's similar assessment of Garrett's claim.  Garrett contracted for the representation of the Favret Firm and in particular Demarest.  Because of Demarest's health problems, Schaumburg, who regularly works with Demarest and is a partner in the Favret Firm, took over primary responsibility for the case.  The

---

[25] Joint Exhibit 11 is a copy of the reference to decision that Garrett presented during the evidentiary hearing.

record demonstrates that Schaumburg was diligent and professional in pursuit of Garrett's claim.

The record does demonstrate, and both Bland and Schaumburg acknowledge, that Delta Queen's settlement papers sought a release of more than was presented by Garrett's complaint.[26] While the release should have been modified to eliminate the extraneous claims before it was presented to Garrett, Bland stated that he would prepare a revised release and that has since been done.

The critical issue concerns the communications between Garrett and his counsel.  Although Schaumburg and Garrett focus on their conversation of August 16, 2006, there are several conversations or communications at issue.  Garrett acknowledged that Delta Queen disputed his status as a borrowed servant and he was made aware of the significance of the Ruiz factors.  R. 13. He acknowledged having discussions with Demarest about the merits of his claim, but denied that Demarest or Schaumburg told him that he had a weak claim.

Garrett denied having a meeting with Demarest and Schaumburg at which it was agreed they would not go to trial but would instead try to negotiate reductions in the amounts due the health care providers and secure enough from Delta Queen to pay off Charity Hospital.  On July 31, 2006, Schaumburg sent a letter to Garrett confirming such a meeting.  As previously noted, the letter states that, "[w]e agreed that we should avoid trial at all costs due to the likelihood that we would not

---

[26] Delta Queen sought to be released from claims under the Jones Act, Louisiana law, the Federal Employer's Liability Act, 45 U.S.C. § 51, the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, the Americans with Disabilities Act, 42 U.S.C. § 12101, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and other claims.

succeed in proving that you were a borrowed servant of Delta Queen."[27]   On that same date, Schaumburg sent a letter to Bland and Cohn with a copy to Garrett.[28]   Letters were also sent to the health care providers requesting reductions.  Each of these letters described the borrowed servant issue and contained the statement that Garrett's attorneys were "not encouraged by our chances in succeeding at trial. . . ."[29]

Garrett was asked about his receipt of the July 31, 2006 letter confirming the strategy reached at the meeting with Demarest and Schaumburg.  Garrett responded that he did not recall seeing the letter.  R. 20.  Schaumberg read parts of the letter to Garrett and asked a second time if he recalled receiving the letter.  R. 20-22.  At that point, Garrett reported he had just found the letter in his files along with copy after copy of basically the same thing. . . ."  referring to the letters sent to the health care providers.  Garrett then contended that the July 31, 2006 letter meant the case would go to trial.  R. 22.

Garrett's testimony is not credible.  In order to believe him one must conclude that:  (1) Schaumburg lied about having a meeting with Garrett and Demarest at which Garrett was told that his attorneys did not think there was a chance of prevailing at the trial; (2) Schaumburg prepared and sent to Garrett a letter describing a meeting that did not occur and describing a strategy that had not been discussed; (3) Garrett received that letter and copies of letters to health care providers but either Garrett did not read the letters from his counsel or if he did, he chose to ignore the very clear

---

[27]  Joint Exhibit 9 - Exhibit 2 - Letter from Schaumburg to Garrett dated July 31, 2006.

[28]  Joint Exhibit 9 - Exhibit 3 - Letter from Schaumburg to Bland and Cohn, dated July 31, 2006.

[29]  Joint Exhibit 9 - Exhibits 4-8.

language in them reporting that he had a poor case.  Garrett's testimony and conduct at the evidentiary hearing demonstrate that he was literate.  He presented case law that he contended was applicable to his claim.  He carefully read and understood the ten page release.  It defies credibility to suggest that he did not read and understand the letters received from his attorney.

The undersigned does not lightly consider the issue of Garrett's credibility.  In <u>U.S. v. Giacomel</u>, 153 F.3d 257 (5th Cir. 1998), the Fifth Circuit said:

> The district court was not required to rehear the testimony on which the magistrate judge based her findings and recommendation to make an independent evaluation of credibility when, as here, those findings were accepted.  We perceive no error in the district court deferring herein to the magistrate judge's credibility findings; the record adequately supports them.

<u>Id.</u> at 258 (footnote omitted).  Unless the District Court chooses to try the proceeding <u>de novo</u>, Garrett's credibility will not be re-weighed and re-determined.  <u>See</u> <u>Nationwide Mut. Fire Ins. Co. v. Dungan</u>, 818 F.2d 1239, 1243 (5th Cir. 1987); and <u>Franks v. National Dairy Products Corp.</u>, 414 F.2d 682, 685 (5th Cir. 1969).  Garrett, however, put his credibility at issue.  The court finds that: (1) the meeting among Demarest, Schaumburg and Garrett occurred as described in Schaumburg's July 31, 2006 account of the meeting; and (2) Garrett received the July 31, 2006 letter, read it and understood its contends.  Garrett was informed by his counsel that he had a weak case regarding the applicability of the borrowed servant doctrine and that his lawyers would attempt to negotiate settlements with his health care providers and Delta Queen that would relieve Garrett of responsibility for all or much of these debts.

Garrett testified that it was his understanding that it was to Delta Queen's advantage to pay the LSU-Charity Hospital claim because it was willing to accept much less than the full amount of

its claim and, in this way, Delta Queen would avoid paying a greater amount later (after a trial).  R. 19-20.  Garrett's testimony is contradicted by the facts that were obvious from the correspondence he received.  First, LSU-Charity Hospital was entitled to payment of its lien "off the top" of any money Garrett received from his claim.  Contrary to Garrett's "understanding," LSU-Charity Hospital's interest in settling for substantially less than the amount of its claims was based on Schaumburg's report that Garrett had a weak case, and Delta Queen's motivation in resolving the LSU-Charity Hospital claim was in concluding the entire case.  Garrett's testimony regarding his understanding of Delta Queen's interest in putting up $24,500 is not credible nor is it logical.

Garrett argued that a person cannot reach an agreement on settling a case until he sees what is in the settlement document.  R. 84.  This reflects a misunderstanding of the law.  Under federal maritime law, an oral agreement to settle a personal injury case is enforceable and cannot be repudiated.  Strange, 495 F.2d at 1235.  The only remaining issue is whether Garrett agreed to settle the case on August 16, 2006, when he and Schaumburg talked by telephone.

Garrett acknowledged that he talked to Schaumburg on that date.  R. 33.  Schaumburg testified that  he reported to Garrett that:  (1) Delta Queen offered $24,500 to settle the entire case; (2) the $24,500 would go to pay off LSU-Charity Hospital and the Favret law firm; (3) no agreement was reached with the other health care providers but they were not likely to pursue their claims; and (4) Garrett would not receive anything from the settlement other than the resolution of the LSU-Charity Hospital claim.  R. 52-54.  Schaumburg testified that Garrett approved the settlement.  R. 53.  He testified that Garrett understood that the entire case was settled for $24,500 because he told Garrett the case would not go to trial and that the case was over.  R. 59.

Garrett testified that Schaumburg represented to him that he was only agreeing to settle the LSU-Charity Hospital claim and that all other claims against Delta Queen would proceed to trial. Garrett's account of the August 16, 2006 telephone conversation rests exclusively on his testimony. His only effort at providing corroboration is to ask why he would give up his only chance to recover future medical expenses.  He urges that any money tendered by Delta Queen was insignificant compared to his right to future medical expenses.[30]

Schaumburg's account of the conversation is consistent with the strategy that Garrett agreed to in the meeting with Demarest and Schaumburg.  It is consistent with the Schaumburg's reports to LSU-Charity Hospital and the other health care providers that Garrett had a weak case.  It is consistent with the progress of negotiations and Delta Queen's understanding of the settlement.

One possibility is that Garrett was confused about the settlement that Schaumburg described on August 16, 2006.  To reach this conclusion one must believe that Garrett was equally confused about the meeting with Demarest and Schaumburg and the strategy agreed upon at the meeting.  This conclusion is not possible because Schaumburg confirmed the results of the meeting in writing in a letter to Garrett.  The gist of the meeting was also restated in the letters to each of the health care providers.  Garrett received all of these letters.  Garrett demonstrated that he fully comprehended the writings received from Schaumburg.  Confusion as to what occurred on August 16, 2006 is not a possibility.

The only remaining possibility is that after August 16, 2006 Garrett changed his mind. Perhaps, with the passage of nearly two years, the bills from the health care providers no longer

---

[30] Garrett also testified inconsistently when he stated he could "bankrupt the bills."  R.40.

seemed like a pressing issue.  Perhaps Garrett believed he could resolve those bills through a bankruptcy filing and also preserve a claim for future medical benefits.  See R. 37- 38.  Whatever the reason, however, the only conclusion is that, after agreeing to the settlement on August 16, 2006, Garrett changed his mind.  The undersigned finds that on August 16, 2006, Garrett knowingly and voluntarily agreed to settle all claims asserted by him in this action for  a payment of $24,500 from Delta Queen with $15,500 going to LSU-Charity Hospital and the balance going to the Favret law firm in payment of costs advanced and its fee.

## Recommendation

IT IS RECOMMENDED that:

1.     Garrett's motion to recuse the undersigned be denied;

2.     The settlement agreement described herein be enforced;

3.     Garrett be required to execute a release in the form attached hereto as Exhibit 1; and

4.     If Garrett refuses to execute the release, then Delta Queen shall issue two checks: the first payable to Medical Center of Louisiana at New Orleans in the amount of $15,500.00; and the second payable to the Favret Firm in the amount of $9,000.00; and after Delta Queen presents proof of delivery of the two checks, it shall present a motion to dismiss with prejudice.

## Objections

A party's failure to file written objections to the proposed findings, conclusions and

recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 8th day of January, 2007.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**

Exhibit A

## <u>RELEASE</u>

Whereas on or about March 21, 2005, the plaintiff, Thomas Edward Garrett ("Garrett"), filed a petition for seaman's benefits in state court, which was removed to federal court and designated as Civil Action 05-1492-CJB-SS.

In consideration of the sum of Twenty-four Thousand Five Hundred and No/100 ($24,500.00) Dollars, paid by Delta Queen Steamboat Company, Inc. ("Delta Queen"), the receipt of which is acknowledged, Garrett releases Delta Queen from all claims asserted by him in said Civil Action 05-1492-CJB-SS and agrees to dismiss said action with prejudice each party to bear its own costs.

It is expressly agreed that this payment is made by way of compromise and settlement, and is in no way to be construed as an admission of liability by any party.

This _____ day of _____, 2007.


_____
Thomas Edward Garrett